UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------- X
:
**VINCENT BOUKNIGHT,**                                    :
:
**Plaintiff,**                 :
:                    <u>**OPINION AND ORDER**</u>
**- against -**                        :
:                       **09 Civ. 5817 (SAS)**
**YEE-CHEEN DOUNG, M.D., and TONI** :
**McLARVIN, M.D.,**
:
**Defendants.**         :
------------------------------------------------- X
**SHIRA A. SCHEINDLIN, U.S.D.J.:**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7|8|11

## I.   INTRODUCTION

Vincent Bouknight, incarcerated and proceeding pro se, brings this

action pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his Eight

Amendment right to be free from cruel and unusual punishment.  Bouknight

alleges that Drs. Doung and McLaurin[1] demonstrated deliberate indifference to his

serious medical needs by: (1) "intentionally disallow[ing]" a surgical procedure

that had been "scheduled and approved by his treating physician" before his

incarceration; (2) "failing to provide adequate medical care to him following his

---

[1]      Sued incorrectly herein as "Dr. McLarvin." *See, e.g.*, Bellevue
Hospital Medical Records ("Bellevue Records"), Ex. B to 2/11/11 Declaration of
Virginia J. Nimick, Defendants' Counsel, in support of Defendants' Motion to
Dismiss ("Nimick Decl.") at 24 (referring to this Defendant as "Toni McLaurin."

altercation with staff which resulted in a fracture to his left ulna;" and (3) denying his request for a "front-cuff order," which would have prohibited prison officers from applying handcuffs behind his back, thereby avoiding the "severe pain" of having his injured forearm cuffed behind him.[2]  Defendants move to dismiss all claims "for failure to state a cause of action or, in the alternative, for summary judgment pursuant to Federal Rule of Civil Procedure 56."[3]  Because the motion presents evidence outside the pleadings, it is, in fact, a motion for summary judgment.[4]  For the reasons set forth below, Defendants' motion for summary judgment is granted.

## II.    BACKGROUND

### A.    The Alleged Denial of the Scheduled Surgical Procedure

In June 2005, Bouknight sustained a gunshot wound to his left forearm.[5]  He visited Dr. Debra Parisi in August 2005, complaining of significant pain.[6]  After Dr. Parisi "discussed the risk, benefits, and alternatives to operative

---

[2]     Second Amended Complaint ("SAC")  ¶¶ 25-32.

[3]     Defendants' Memorandum of Law in Support of Motion to Dismiss the Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) ("Def. Mem.") at 1.

[4]     *See* Fed. R. Civ. P. 12(d).

[5]     *See* Beth Israel Medical Records, Ex. C to SAC, at 2.

[6]     *Id.*

management" with Bouknight he elected to proceed with surgery on his forearm.[7]

The surgery was completed on September 29, 2005, at Beth Israel Medical Center

("Beth Israel") with "no complications."[8]  On January 31, 2006, Dr. Parisi signed a

prescription form for Bouknight indicating that he would "require more surgery . . .

to improve his motion & function."[9]

     Bouknight had six follow-up post-surgical appointments with Dr.

Parisi to monitor the outcome of his surgery.[10]  He had been "noncompliant with

his therapy because of difficulties with his medical insurance" and "never regained

pronation and supination of the forearm."[11]  On June 5, 2006 (the sixth visit), x-

rays revealed that Bouknight had developed "a synostosis between the proximal

radius and proximal ulna."[12]  Dr. Parisi scheduled another surgery to "take down

---

[7]      *Id.*

[8]      *Id.* at 5.  *See also* Notes of Dr. Debra Parisi ("Parisi Notes"), Ex. D to SAC, at 1.  Bouknight asserts that the surgery was on October 6, 2005.  *See* SAC ¶ 12.  This one-week difference is immaterial for purposes of this motion.

[9]      Parisi Notes at 18.

[10]      *Id.* at 1-7.

[11]      *Id.* at 8.  "Pronation" and "supination" refer to one's ability to rotate the forearm and wrist to face palms upward or downward.  *See* http://anatomy.med.umich.edu/surface/upper_limb/pronate.html.

[12]      *Id.*  "Synostosis" is a "union between adjacent bones . . . formed by osseous material, such as ossified connecting cartilage."  *See* http://www.nlm.nih.gov/cgi/mesh/2011/MB_cgi?mode=&term=Synostosis&field=

the proximal synostosis and try to regain his pronation and supination."[13]  The

surgery was scheduled for July 21, 2006.[14]

Bouknight was arrested and incarcerated in Rikers Island Jail

Complex ("Rikers") on June 30, 2006, before the scheduled surgery.[15]  Bouknight

visited the Rikers orthopedic clinic on several occasions in 2006.[16]  On July 10,

2006, the attending physician, non-party Dr. Marie Francois, wrote "[Bouknight]

wishes to have [Dr. Parisi] operate on him again.  Surgical request (orthopedics)

submitted to the senior M.D. attention."[17]  Bouknight alleges that on "July 21,

200[6, he] was transported to Beth Israel for the scheduled surgery, but was

returned to [Rikers], immediately before the start of surgery on orders of the

---

entry.

[13]      Parisi Notes at 8.

[14]      *See* Plaintiff's Memorandum of Law Opposing Motion For Summary
Judgment ("Pl. Mem.") ¶ 4.

[15]      *See id.*  Although Bouknight alleges he was incarcerated on June 5,
2006 (*see* SAC ¶ 16) the documents he now submits show the date of incarceration
as June 30, 2006.  *See* Pl. Mem. ¶ 4.

[16]      *See* Rikers Medical Records ("Rikers Records"), Ex. C to Nimick
Decl. at 2, 45-47, 73-75, 89, 97-98, 116, 120.

[17]      *Id.* at 97.

-4-

Defendants."[18]

The first documented interaction between Bouknight and Defendants occurred on October 31, 2006, at Bellevue Hospital ("Bellevue").[19]  The medical records of that date reveal that Defendants intended to "[discuss with] team re: possible operation to increase [pronation and supination of] wrist. [Patient] understands that surgery may not treat [range of motion] entirely, will likely not treat pain, and that stiffness may recur."[20]  Bouknight returned to Bellevue on November 28, 2006, where the attending physician (non-party Dr. Nirmal Tejwani,)"discussed patient's exam and [x-ray] with orthopedic team.  There is no orthopedic intervention that will help this patient at this time.  Patient angry and I would recommend a second opinion at another facility."[21]  Bouknight next saw Defendants on April 24, 2007, and continued to complain of pain in his forearm.  Defendants noted Bouknight's complaints of pain and lack of pronation and supination, but again determined that he was a "nonoperative candidate."[22]

---

[18]     SAC ¶ 17.  Bouknight lists the year as 2005, but it is apparent that he meant 2006.  However, Bouknight offers no proof in support of this allegation.

[19]     Bellevue Records at 24.  It is not clear whether Defendants are affiliated with Bellevue or Rikers, or where they maintained their medical offices.

[20]     *Id.*

[21]     *Id.* at 23.

[22]     *Id.* at 22.

Bouknight alleges that this determination was a "denial of adequate medical treatment" sufficiently egregious to violate his constitutional rights.[23]

### B.   The Alleged Failure to Provide Adequate Medical Care Following an Altercation

Records from Rikers indicate that Bouknight complained of pain following an altercation on December 21, 2007, after which he twice visited the Rikers clinic for evaluation.  Neither of these visits involved Defendants.[24] Bouknight alleges that he was denied appropriate medical care after the altercation, which he supports by submitting a "Request for Radiological Examination."[25]  It reads: "[patient] states that he had an altercation and plate and screws 'broke.' Please evaluate."[26]  The top portion of the form, filled out by an unnamed official, recommended that Bouknight's left elbow, ulna, and radius be x-rayed.[27]

The form was then turned over to a roentgenologist,[28] who recorded

---

[23]    Pl. Mem. ¶ 2.

[24]    Rikers Records at 160-162.

[25]    Request for Radiological Examination, Ex. E to SAC.  The form, dated October 10, 2008, has "Downstate Corr. Fac." handwritten across the top, indicating that Bouknight may have been transferred from Rikers to Downstate.

[26]    *Id.*

[27]    *See id.*

[28]    A roentgenologist specializes in radiology and the administration of x-rays.  *See* http://www.merriam-webster.com/dictionary/roentgenologist.

that an x-ray exam of Bouknight's left forearm showed a "well healed fracture . . . of radius immobilized with 12cm metallic plate & screws which appear intact. Numerous retained small metallic fragments in soft tissues proximal forearm anteriorly & in proximal radial shaft at site of healed fracture."[29]  The roentgenologist recommended a follow-up visit.[30]  The follow-up consultation occurred on November 4, 2008.[31]  Although the attending physician's notes regarding this consultation are largely illegible, it appears that she found Bouknight had sustained a "relatively new" fracture to his left ulna that may have been caused by the "altercation."[32]  There is no evidence linking Defendants to any aspect of Bouknight's "altercation."

C.     The Alleged Denial of a "Front-Cuff Order"

Bouknight alleges that Defendants "intentionally and/or negligently did not grant this simple [front-cuff] order . . . .  As a result of Defendants' intentional and/or negligent actions (or lack thereof), plaintiff suffered hours of severe pain and mental anguish[.]"[33] Medical records from Rikers indicate that

---

[29]     Request for Radiological Examination.

[30]     *Id.*

[31]     *See* Request and Report of Consultation, Ex. I to Pl. Mem.

[32]     *Id.*

[33]     SAC ¶¶ 31-32.

attending physicians recommended front-cuffing Bouknight on August 13, October 15, and October 25 of 2007.[34]  It is unclear whether these recommendations constituted "orders" that correctional offers were bound to follow, or simply doctors' opinions on the proper course of care.

A front-cuff order was granted to Bouknight by Great Meadow Correctional Facility on June 9, 2009, but Bouknight appears to allege that this order was vacated the day after it was received.[35]  Another official front-cuff order, granted by Southport Correctional Facility on July 30, 2009, was scheduled to last for 180 days.[36]  There is no evidence linking Defendants to any decision to grant, deny, vacate, or ignore a front-cuff order.

## III.   LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[37]  "'An issue of fact is genuine if the evidence is such that a reasonable jury

---

[34]     *See* Rikers Records at 189, 231, 259.

[35]     Front-Cuff Orders, Ex. F to SAC.

[36]     *See id.*  There is no documentary evidence to indicate precisely when Bouknight was transferred from Rikers to either Great Meadow or Southport.

[37]     Fed. R. Civ. P. 56(c).

could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of the suit under the governing law.'"[38]  "[T]he burden of demonstrating that no material fact exists lies with the moving party . . ."[39]  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence . . . on an essential element of the nonmovant's claim."[40]

      To defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.[41]  The non-moving party must do more than show that there is "'some metaphysical doubt as to the material facts,'"[42] and "'may not rely on conclusory allegations or unsubstantiated speculation.'"[43] However, "'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge

---

[38]      *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 34 (2d Cir. 2008)).

[39]      *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008).

[40]      *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

[41]      *See id.*

[42]      *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[43]      *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

to resolve the parties' differing versions of the truth at trial.'"[44]

## IV.   APPLICABLE LAW

### A.      Section 1983

Section 1983 states, in relevant part, that

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

Section 1983 "does not create a federal right or benefit;  it simply provides a

mechanism for enforcing a right or benefit established elsewhere."[45]  "The purpose

of [section]1983 is to deter state actors from using the badge of their authority to

deprive individuals of their federally guaranteed rights and to provide relief to

---

[44]     *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)).

[45]     *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.*, 423 F.3d 153, 159 (2d Cir. 2005) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).  *Accord  Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002) ("'[O]ne cannot go into court and claim a 'violation of § 1983' – for § 1983 by itself does not protect anyone against anything.'") (quoting *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979)).

-10-

victims if such deterrence fails."[46]  In order to state a claim under section 1983, a

plaintiff must show that the conduct complained of was committed by a person or

entity acting under color of state law, and that the conduct deprived a person of

rights, privileges, or immunities secured by the Constitution.[47]  Furthermore,

imposition of liability under section 1983 requires a defendant's direct

involvement in the alleged constitutional violation.[48]

      The applicability of section 1983 to private parties is limited to those

circumstances in which the parties may be considered to be acting "under color of

state law."[49]

>       The actions of nominally private entities are attributable to the
> state when those actions meet one of three tests: 1. The
> "compulsion test:" the entity acts pursuant to the coercive power

---

[46]    *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

[47]    *See Palmieri v. Lynch,* 932 F.3d 73, 78 (2d Cir. 2004).

[48]    In section 1983 suits, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal v. Ashcroft,* 129 S. Ct. 1937, 1948 (2009). *Accord Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under §1983.'") (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991)).

[49]    Bouknight has not pled, and Defendants have not raised, any facts which indicate that Defendants did or did not act under color of state law.  While the nature of the relationship between Defendants and the State is unknown, Defendants did not raise this issue in their motion.  It is therefore assumed that Defendants acted under color of State law for purposes of this motion.

of the state or is controlled by the state, 2. The "public function test:" the entity has been delegated a public function by the [s]tate, or, 3. The "joint action test" or "close nexus test:" the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the [s]tate, or the entity's functions are entwined with state policies.[50]

**B.    Eighth Amendment Right to be Free from Deliberate Indifference to Serious Medical Needs**

Because Bouknight was a pre-trial detainee during the time of Defendants' alleged violations, his claims are governed by the Fourteenth Amendment.[51]  In substance, there is no difference in the standards governing pre-trial detainees and prisoners.[52]

---

[50]    *Hollander v. Copacabana Nightclub,* 624 F.3d 30, 34 (2d Cir. 2010) (quoting *Sybalski v. Independent Group Home Living Program, Inc.,* 546 F.3d 255, 257 (2d Cir. 2008)) (some quotation marks omitted).  *Accord Flagg v. Yonkers Sav. and Loan Ass'n,* 396 F.3d 178, 187 (2d Cir. 2005)*; Bhatia v. Yale Sch. of Med.,* 347 Fed. Appx. 663, 664-65 (2d Cir. 2009); *Mitchell v. Home,* 377 F. Supp. 2d 361, 369 (S.D.N.Y. 2005).

[51]    *See Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000).  In the case of a pre-trial detainee, "'the cruel and unusual punishment proscription of the Eight Amendment to the Constitution does not apply,' because 'as a pre-trial detainee, [the plaintiff is] not being punished.'  Instead, a person detained prior to conviction receives protection against mistreatment at the hands of prison officials under the . . . Due Process Clause of the Fourteenth Amendment if held in state custody."  *Caiozzo v. Koreman*, 581 F.3d 63, 69 (2d Cir. 2009) (quoting *Cuoco*, 222 F.3d at 106 (alteration in original)).

[52]    *See Robinson v. California*, 370 U.S. 660, 666 (1962).  "[T]he standard for analyzing a pre-trial detainee's Fourteenth Amendment claim is the same as the Eighth Amendment standard."  *Thomas v. Nassau County Corr. Ctr.,* 288 F. Supp. 2d 333, 337 (E.D.N.Y. 2003).

The Eighth Amendment prohibits the infliction of cruel and unusual punishment on prisoners.[53] The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment."[54] Prison officials have a "duty . . . to ensure that inmates receive adequate medical care."[55] But "the prison official's duty is only to provide reasonable care . . . '[P]rison officials who act reasonably [in response to an inmate health risk] cannot be found liable under the Cruel and Unusual Punishment Clause[.]'"[56]

The Cruel and Unusual Punishment Clause embodies both an objective and a subjective prong.[57] "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate

---

[53]    *See* U.S. Const. amend. VIII.

[54]    *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173 (1976)). *Accord Farmer v. Brennan*, 511 U.S. 825, 834 (1994) ("To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind. In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety . . . " (quotation marks and citations omitted)).

[55]    *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (citing *Farmer*, 511 U.S. 825, 832, 844 (1994)).

[56]    *Id.* at 279-80 (quoting *Farmer*, 511 U.S. at 845) (alteration in original).

[57]    *See id.* at 279-81.

-13-

indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind."[58]  "Because the Eighth Amendment is not a vehicle for medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."[59] The deliberate indifference standard is therefore high, and generally will not be met by mere complaints of negligence or allegations of medical malpractice.[60]

## V.      DISCUSSION

### A.      Count One - Denial of Surgery

The undisputed facts do not support Bouknight's allegations that he was denied a necessary surgical procedure by Defendants.  Bouknight was first evaluated by Defendants in October, 2006.[61]  But the alleged denial of surgery

---

[58]      *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir. 2003) (quoting *Estelle*, 429 U.S. at 104)).

[59]      *Id.* (citing *Estelle*, 429 U.S. at 105-06).

[60]      *See Estelle,* 429 U.S. at 106.  *See also Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir. 1998) ("The required state of mind, equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference" (citations omitted)).

[61]      Defendants' Statement of Material Facts submitted pursuant to Local Rule 56.1 ¶ 8.  *Accord* Bellevue Records (indicating that Bouknight's first interaction with Defendants was in October, 2006).

occurred on July 21, 2006.[62]  Bouknight has not submitted any evidence indicating that Defendants met him prior to October, 2006, or had any role in the decision to withhold surgery.  No reasonable jury could find that Defendants committed the act complained of in the SAC.  Defendants were not personally involved in the decision to withhold surgery in July, 2006.

Even construing the SAC liberally to include subsequent denials which did involve Defendants, the undisputed facts demonstrate that Bouknight subsequently visited several doctors at Bellevue, each of whom determined that he was not a candidate for a second operation.[63]  Bouknight offers no evidence that Defendants' decision to deny surgery was anything other than a considered medical judgment.  While Bouknight clearly disagrees with this judgment, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim."[64]

If Defendants' medical decision was poorly reasoned or wrong, Bouknight may have a claim for medical malpractice.  But malpractice does not constitute a cause of action under the Eighth Amendment.  The deliberate

---

[62]    SAC ¶ 17.

[63]    *See* Bellevue Records at 23-33.

[64]    *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998).

indifference prong sets a high bar – to be liable, a defendant must have acted with a culpable "'state of mind that is the equivalent of criminal recklessness.'"[65]  There is nothing to substantiate the allegation that Defendants were deliberately indifferent when they saw Bouknight at Bellevue or that their decisions were based on financial considerations.  Bouknight's allegations are conclusory and unsubstantiated.  Summary judgment is therefore granted to Defendants on Bouknight's first count.

### B.    Count Two - Denial of Adequate Care Following Altercation

Bouknight alleges that Defendants "intentionally denied proper radiography diagnostics, failed to diagnose and assess proper treatment, failed to stabilize his arm in a split [sic] or cast, and refuse any of plaintiff's requests for follow-up care, subjecting the plaintiff to unnecessary and wanton infliction of pain."[66]

Voluminous records from Bellevue, Rikers, and other correctional facilities have been submitted by both parties.  There is no evidence that either Defendant was personally involved with Bouknight's care after the "altercation."  Again, a defendant cannot be liable for constitutional torts if he was not

---

[65]    *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)).

[66]    SAC ¶ 28.

"personal[ly] involve[d]."[67]  Defendants' motion for summary judgment is

therefore granted on Count Two.[68]

### C.    Count Three - Denial of a "Front-Cuff Order"

Bouknight has alleged that Defendants denied him a front-cuff order

"intentionally and/or negligently," which caused him "severe pain and mental

anguish."[69]  When a defendant denies a front-cuff order for no justifiable reason, a

cause of action may lie under the Eighth Amendment.[70]  However, Bouknight has

offered no evidence that Drs. Doung and McLaurin played any role whatsoever in

denying a front-cuff order.

A jury could not reasonably find that Defendants were personally

involved with any decision to deny a front-cuff order.  None of the exhibits

Bouknight has submitted indicate that Defendants had the authority to grant such

an order.  There is no evidence (apart from Bouknight's unsubstantiated

---

[67]    *Wright,* 21 F.3d at 501.

[68]    Even if Defendants had been personally involved with Bouknight's
medical care after the altercation, Bouknight has offered no proof of deliberate
indifference.  He was x-rayed, evaluated, and treated by numerous medical
professionals after the "altercation."

[69]    SAC ¶¶ 31-32.

[70]    *See Madison v. Mazzuca*, No. 02 Civ. 10299, 2004 WL 3037730, at
*8 (S.D.N.Y. Dec. 30, 2004) (finding an alleged denial of a front-cuff order,
sufficient to state a claim for an Eighth Amendment violation under section 1983).

allegations) showing that either Defendant had negligently or intentionally refused to grant the order.  The only evidence respecting cuff orders shows that non-party doctors and prison officials recommended that Bouknight be granted a front-cuff order on five separate occasions.[71]  This evidence does not raise any material issue of fact regarding Defendants' personal involvement.  Accordingly, the motion for summary judgment is granted with respect to Count Three.

## VI.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in its entirety.  The Clerk of the Court is directed to close this motion (docket #24) and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            July 8, 2011

----

[71]     *See supra* nn. 35-36.

-18-

**- Appearances -**

**Plaintiff (Pro Se):**

Vincent Bouknight
# 08-A-5373
Clinton Correctional Facility
P.O. Box 2001
Dannemora, New York 12929

**For Defendants**:

Virginia J. Nimick, Esq.
Heidell, Pittoni Murphy & Bach LLP
99 Park Avenue
New York, New York 10016
(212) 286-8585